# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**HABITAT EDUCATION CENTER, INC., et al,**
        **Plaintiffs,**

    **v.**                          **Case No. 08-C-0043**

**UNITED STATES FOREST SERVICE, et al.,**
        **Defendants.**

## DECISION AND ORDER

Plaintiffs filed the present action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, arguing that in approving a project (the "Fishbone" project) in the Chequamegon-Nicolet National Forest ("CNNF"), the Forest Service violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., and the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 –1687.  Before me are the parties' cross-motions for summary judgment.

## I.  BACKGROUND

The CNNF covers approximately 1.5 million acres in northern Wisconsin, where between the mid-nineteenth century and the Great Depression timber barons and forest fires reduced Wisconsin's old-growth forests to "brush fields, eroded fallow pastures, and burned-over stump patches."  See History of the Chequamegon-Nicolet National Forests ("History of CNNF") at 2-4.[1]  After the timber barons denuded the forest, speculators sold what remained as farmland.  The land was unproductive, however, and the farmers could not earn enough to pay their property taxes, causing them to abandon their lands or forfeit them to county governments.  Id. at 3; Fishbone Record of Decision ("ROD") at 2.

---

[1] Available at: http://www.fs.fed.us/r9/cnnf/general/history/detailed_history.pdf (last viewed March 18, 2009).

In the late 1920s, the federal government began purchasing the abandoned land from the counties and managing it as a national forest. During the Great Depression, the Civilian Conservation Corp planted thousands of acres of pine throughout the barren farmland. ROD at 2. In 1933, the government's collective purchases were designated as the Nicolet National Forest. Because the national forest emerged from the government's purchases of individual tracts of land and was not carved from large blocks of public land, it had a fragmented ownership pattern, characterized by a patchwork of public and private lands. History of CNNF at 4. In 1933, these lands were aggregated into two, noncontiguous units, the Nicolet East and Nicolet West. The Nicolet West eventually became the Chequamegon National Forest. For sixty years, the Forest Service managed the Nicolet and Chequamegon units as separate national forests. Since 1993, however, the units have been managed as a single entity, now known as the Chequamegon-Nicolet National Forest. Id. Although the amount of national forest land has grown over the years, the Nicolet and Chequamegon units remain noncontiguous. The Nicolet unit is located on the eastern half of northern Wisconsin, east of Rhinelander, and the Chequamegon is located on the western half of northern Wisconsin, near Park Falls.[2]

As a result of the Forest Service's management of the CNNF, the land has returned to forest conditions, although it is now a young forest characterized by even-aged stands (i.e., trees that are roughly the same age). ROD at 2. While this is an improvement over the conditions left by the timber barons, a truly healthy forest contains trees of different ages, as well as a variety of tree species. Id. Thus, one of the Forest Service's objectives in managing

_____

[2]A map showing the location of the two units is available at the CNNF website, http://www.fs.fed.us/r9/cnnf/general/onlinemap/index.html (last viewed March 18, 2009). See also infra p. 15.

the forest is to encourage a diversity of tree species and a diversity of tree ages throughout the CNNF.  Id.  One of the tools that the Forest Service uses to further this objective is selective timber harvesting through restoration projects, such as the project at issue in this case.  Id.  When selected trees are harvested from an even-aged stand, the stand becomes more diverse over time, as younger trees replace the harvested trees and compliment the older trees that were left in the stand.[3]  Id.  Thus, restoration projects further not only the economic interests of those who benefit from forest commodities, but also the objective of forest diversity.

On June 18, 2007, Jeanne M. Higgins, the Forest Supervisor for the CNNF, issued a Record of Decision ("ROD") in which she approved the Fishbone project, a restoration project located on the Chequamegon side of the forest.  Before deciding to implement the project, the Forest Service surveyed the project area and identified a number of project goals.  Those goals were designed to bring the project area closer to the condition described by the Forest Plan for the CNNF, a document that the Forest Service created in 2004 to guide its overall management of the forest.  The Forest Service identified five project goals, including the reduction of old-age oak and aspen trees (which are susceptible to pests and diseases) and the provision of timber to meet the demand for wood products.  See, e.g., Environmental Impact Statement, at ii-iv (executive summary).  The resulting project will involve a variety of activities, including various harvesting methods, some road building and some road closings. See, e.g., ROD at 9 (Table 3).

Because the Fishbone project is a "major Federal action[] significantly affecting the quality of the human environment," NEPA required the Forest Service to prepare an

_____

[3]In addition to selective harvesting, the Forest Service allows some clear-cutting, in which all trees in an area are harvested.

Environmental Impact Statement ("EIS") for the project, which is "a detailed analysis and study conducted to determine if, or the extent to which, a particular agency action will impact the environment." See Highway J Citizens Group v. Mineta, 349 F.3d 938, 953 (7th Cir. 2003). The final version of the EIS for the Fishbone project was published in June 2007.

The plaintiffs, environmental advocates, challenged the ROD approving the Fishbone project in administrative proceedings. After exhausting their administrative remedies, plaintiffs commenced this action, which is the fifth in a series of actions that plaintiffs have filed in this District against the Forest Service relating to their approval of restoration projects within the CNNF. In three of the previous three actions, I determined that the Forest Service did not fully comply with NEPA and enjoined the projects until such time as the Forest Service remedied their non-compliance. See Habitat Educ. Ctr. v. Bosworth, 381 F. Supp. 2d 842 (E.D. Wis. 2005) ("Habitat III"); Habitat Educ. Ctr. v. Bosworth, 363 F. Supp. 2d 1090 (E.D. Wis. 2005) ("Habitat II"); Habitat Educ. Ctr. v. Bosworth, 363 F. Supp. 2d 1070 (E.D. Wis. 2005) ("Habitat I"). More recently, I found that the Forest Service's decision to approve a project complied with NEPA and NFMA. See Habitat Educ. Ctr. v. U. S. Forest Service, 593 F. Supp. 2d.1019 (E.D. Wis. 2009) ("Habitat IV"). Although the present action arises out of the same forest, involves some of the same species, and has some issues in common with the previous actions, the actions are otherwise unrelated. The project involved in the present case has its own administrative record, which I review independently of my decisions in the three earlier cases. See Habitat Educ. Ctr. v. Kimbell, 250 F.R.D. 390, 394-95 (E.D. Wis. 2008) (explaining that each project is distinct and must be reviewed independently and on its own administrative record).

In bringing this action, plaintiffs express concern about the Forest Service's management of two sensitive species that inhabit the CNNF: Northern Goshawk and Red-

shouldered Hawk.  They argue that the Forest Service has not adequately analyzed the potential impact of the Fishbone project on the habitat of these species.  A brief overview of these species and their habitat will help the reader understand the parties' positions in this case.[4]

The Northern Goshawk is a large, forest dwelling raptor (i.e., bird of prey) that generally makes its habitat in mature deciduous, conifer or mixed forest.  The CNNF is at the southernmost edge of goshawks' breeding range.  Because of this, goshawks are expected to occur in the CNNF in lower numbers and with higher variation than at the core of their range.  Even before the timber barons, goshawks were considered rare summer residents. After the northern hardwoods were logged, goshawks persisted in pockets of unharvested land.  Research in the 1970s indicated that goshawks were becoming more common in the northeast portion of the state (i.e., near the Nicolet side of the CNNF).  In the mid-1980s, however, severe depredation by racoons and fisher began to affect the population.

The Red-shouldered Hawk is a medium-to-large woodland hawk that makes its habitat in mature hardwood forest near riparian areas.  Prior to 1900, it was one of the most common hawks in the eastern United States, but it has probably never been common in Wisconsin. Once again, logging in the late nineteenth and early twentieth centuries destroyed much of its habitat.  Presently, the Red-shouldered Hawk is an uncommon summer resident in Wisconsin.

_____

[4]My overview of sensitive species and their habitats is taken from the Biological Evaluation that the Forest Service prepared for the Fishbone project.  R. 427 et seq.

## II. DISCUSSION

**A.    NEPA**

### 1.    Standard of Review

When an agency's decision is challenged under the APA based on the agency's failure to comply with NEPA, the standard of judicial review is a narrow one. <u>Highway J</u>, 349 F.3d at 952.  The court is not empowered to examine whether the agency made the "right" decision, but only to determine whether, in making its decision, the agency followed the procedures prescribed by NEPA.  <u>Id.</u> (NEPA "'does not mandate particular results, but simply prescribes the necessary process.'")  In the present case, plaintiffs argue that the Forest Service did not comply with the procedures required by NEPA because it did not prepare a satisfactory EIS before approving the Fishbone project.

As noted, NEPA requires that federal agencies prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  An EIS is "a detailed analysis and study conducted to determine if, or the extent to which, a particular agency action will impact the environment."  <u>Highway J</u>, 349 F.3d at 953.  Requiring an agency to prepare an EIS serves two purposes.  First, "'[i]t ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts.'" <u>Dep't of Transp. v. Public Citizen</u>, 541 U.S. 752, 768 (2004) (quoting <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 349 (1989)) (alteration in original).  Second, "it 'guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.'" <u>Id.</u> Thus, the agency must "articulate why [it has] settled upon a particular plan and what environmental harms (or benefits) [its] choice entails." <u>Simmons v. U.S. Army Corps of Eng'rs</u>, 120 F.3d 664, 666 (7th Cir. 1997).  The EIS

must show that agency officials have "[thought] through the consequences of – and alternatives to – their contemplated acts," and must ensure that "citizens get a chance to hear and consider the rationales the officials offer." Id. Stated differently, the agency must demonstrate that it "has taken a 'hard look' at environmental consequences." Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976).

In my most recent decision arising out of the CNNF, I identified standards to apply when determining whether an EIS satisfies NEPA. See Habitat IV, 593 F. Supp. 2d at 1024-26. As I noted, the Supreme Court and Seventh Circuit have stated that "the only role for a court [in the NEPA context] is to insure that the agency has taken a 'hard look' at environmental consequences." Kleppe, 427 U.S. at 410 n.21; Environmental Law & Policy Ctr. v. U.S. Nuclear Regulatory Comm'n, 470 F.3d 676, 682 (7th Cir. 2006); Highway J, 349 F.3d at 953. However, "[w]hat constitutes a 'hard look' cannot be outlined with rule-like precision," Nat'l Audubon Soc'y v. Dep't of the Navy, 422 F.3d 174, 185 (4th Cir. 2005), and it is a standard that "is not susceptible to refined calibration," Churchill County v. Norton, 276 F.3d 1060, 1071 (9th Cir. 2001) (internal quotation marks and citation omitted). Rather than apply a rigid standard, a court must make a "pragmatic judgment" as to whether the agency has fostered the two principal purposes of an EIS: informed decisionmaking and informed public participation. Id.

In making its pragmatic judgment, a court must be careful not to "'flyspeck' an agency's environmental analysis, looking for any deficiency, no matter how minor." Nat'l Audubon Soc'y, 422 F.3d at 186. With a document as complicated and mired in technical detail as an EIS, it will always be possible to point out some potential defect or shortcoming, or to suggest some additional step that the agency could have taken to improve its environmental analysis. An EIS is unlikely to be perfect, and setting aside an EIS based on minor flaws that have little

or no impact on informed decisionmaking or informed public participation would defy common sense. Thus, rather than getting bogged down in possible technical flaws, a court must "take a holistic view of what the agency has done to assess environmental impact." Id. Further, courts must remember that it is the agency, and not the court, that has the technical expertise required to perform the environmental analysis in the first place. This means that judicial review of an EIS must be deferential, especially when it comes to the scientific and technical details that make up the heart of the analysis. Citizens for Alternatives to Radioactive Dumping v. Dep't of Energy, 485 F.3d 1091, 1098 (10th Cir. 2007) (judicial deference is "especially strong" where decision involves technical or scientific matters within agency's area of expertise). Of course, deferential review does not mean no review, and courts must ensure that agencies carry out their duties under NEPA, make reasoned choices, and provide a discussion that fully and frankly explains the environmental consequences of a proposed action. However, to strike a proper balance between deference and a "searching and careful" inquiry, Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989), a court may invalidate an EIS only if, after first learning what is going on so that it does not decide on the basis of superficial beliefs and assumptions, the court is firmly convinced that an error or omission in the EIS has defeated the goals of informed decisionmaking and informed public participation. Cf. Eagle Foundation, Inc. v. Dole, 813 F.2d 798, 803 (7th Cir. 1987). Again, this standard of review is not precise, but requires that the court exercise good judgment.[5]

_____

[5]Some courts have described this standard as applying a "rule of reason," under which the court asks "whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." See, e.g., Churchill County, 276 F.3d at 1071 (internal quotation marks and citation omitted); see also Ecology Ctr., Inc. v. United States Forest Service, 451 F.3d 1183, 1189-90 (10th Cir. 2006) ("We apply a rule of reason standard (essentially an abuse of discretion standard) in deciding whether claimed deficiencies in a [final] EIS are merely flyspecks, or are significant enough to defeat the goals of informed decision making and informed public comment.").

With this standard in mind, I turn to plaintiffs' arguments.

**2.      Analysis of Reasonable Alternatives**

An EIS must discuss alternatives to a proposed action. 42 U.S.C. § 4332(c)(iii). The regulations promulgated by the Council on Environmental Quality ("CEQ")[6] specify that the agency preparing an EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). Plaintiffs argue that the Forest Service failed to rigorously explore and objectively evaluate two alternatives (Alternatives 6 and 8) that would provide greater protection for Northern Goshawk and Red-shouldered Hawk.[7]  The Forest Service responds that it was not required to study such alternatives in detail because it briefly discussed the reasons for eliminating them from detailed study.

When evaluating alternatives to a proposed action, an agency must answer three questions in order. First, what is the purpose of the proposed project? Second, given that purpose, what are the reasonable alternatives to the project? And third, to what extent should the agency explore each particular alternative? Simmons, 120 F.3d at 668. These are questions for the agency to resolve in the first instance, and a court owes deference to the agency on whether the agency answered the questions in a permissible way. Id. at 668-69.

_____

[6]NEPA established CEQ as an agency within the Executive Office of the President. It "coordinates federal environmental efforts and works closely with agencies and other White House offices in the development of environmental policies and initiatives." See http://www.whitehouse.gov/ceq/aboutceq.html (last viewed March 18, 2009).

[7]After oral argument, I allowed plaintiffs to file supplemental briefs, and in those briefs plaintiffs discuss part of their reasonable-alternatives argument (the part in which they claim that the Forest Service adopted an overly-narrow set of project goals) under NFMA. Thus, I discuss these arguments in my NFMA analysis, below. Here, I address under NEPA plaintiffs' arguments that the Forest Service failed to consider two specific alternatives.

The court's only role is to ensure that the agency followed required procedures, evaluated relevant factors, and reached a reasoned decision. Id. at 669.

Under the Simmons framework, I start by examining the way in which the Forest Service identified the purposes of the Fishbone project. The EIS explains the Forest Service's purposes in detail. EIS at 1-1 to 1-7. The general purpose is to bring the project area closer to the long-term goals identified in the 2004 Forest Plan for the CNNF. EIS at 1-3. The Forest Service studied the project area and identified discrepancies between the area's current condition and the desired condition as described in the Plan. Id. The Forest Service then formulated five specific objectives to address some of the discrepancies: (1) restoring forest health and improving economic value in older, decadent and/or diseased oak and aspen stands; (2) improving the vigor, health and future economic value of red pine plantations; (3) restoring small, open areas and "pocket barrens"; (4) providing an efficient and safe road system; and (5) providing timber to meet local and/or regional demands for wood products. Id. at 1-4 to 1-7. Although plaintiffs argue that the Forest Service defined these goals "too narrowly" (Pls.' Reply Br. at 9), they do not point to any flaws in the formulation of these objectives but simply speculate that the Forest Service must have rigged the objectives to favor timber interests. However, the EIS reasonably explains how each goal is tailored to address a specific directive in the Forest Plan.[8] EIS at 1-4 to 1-7. Thus, I find that the Forest Service complied with NEPA when identifying the goals of the Fishbone project.[9]

_____

[8]Plaintiffs do not contend that any part of the Forest Plan is unlawful.

[9]Because the Forest Service studied the project area before formulating the project's objectives, this case is distinguishable from Simmons, in which the Seventh Circuit admonished an agency for uncritically accepting a project objective from a permit applicant. 120 F.3d at 669.

The next step of the Simmons framework is to identify the reasonable alternatives that will satisfy the project's purposes. The Forest Service prepared an EIS that analyzed five alternative means to achieving the Fishbone project's objectives – four action alternatives and one "no action" alternative.[10] EIS at 2-1 to 2-20. In addition to these five alternatives, which the Forest Service studied in detail, the Forest Service briefly discussed three other alternatives that were eliminated from detailed study. Id. at 2-8 to 2-11. Plaintiffs argue that the Forest Service wrongly excluded two of these alternatives (Alternatives 6 and 8) from detailed study.

Alternative 6 was designed to provide additional protection for active goshawk nests within the project area by shifting 400 to 500 acres of timber harvest away from the nests. EIS at 2-8. The Forest Service eliminated this alternative from detailed study after it incorporated this design feature into Alternative 2, which was studied in detail. Id. (stating that "original proposal" (Alternative 2) was modified to shift 400 to 500 acres of harvest away from goshawk nests). Plaintiffs concede that this shift was incorporated into alternatives that were studied in detail but contend that the discussion of Alternative 6 in the EIS is somewhat confusing. (Pls.'s Reply Br. at 6.) However, the discussion communicates the important point, which is that the goshawk-protective features of Alternative 6 were incorporated into Alternative 2, and therefore I find that the discussion in the EIS is clear enough to foster informed decisionmaking and public participation.

Alternative 8 is plaintiffs' proposed alternative. The Forest Service excluded it from detailed study under the second and third steps of the Simmons framework – that is, because

_____

[10]As the name implies, the "no action" alternative is the status quo. The CEQ regulations require that the agency always study a no action alternative. 40 C.F.R. §1502.14(d).

it was not a project that satisfied the project's purposes as defined in step one, and because it suggested unnecessary measures and included components that were already incorporated into the other alternatives that the Forest Service studied in detail. The EIS contains almost three, single-spaced pages devoted to a point-by-point evaluation of plaintiffs' proposal and an explanation of its rationale for excluding it from detailed study, including an explanation as to why the proposal is inconsistent with the goals of the project. EIS at 2-9 to 2-11. Plaintiffs respond not by showing that its alternative satisfied the five project goals, but by stating that those goals are too narrow. (Pls.' Reply Br. at 9.) But as noted, the Forest Service formulated its goals after surveying the area and identifying what needed to be done to bring it closer to the conditions described in the Forest Plan. Plaintiffs do not argue that the process by which these goals were formulated was infected by flawed science or analysis, but speculate that something must be wrong with the goals because they resulted in reasonable alternatives that, in plaintiffs' opinion, are too similar. However, plaintiffs' speculation is not grounds for upsetting the Forest Service's decision, and I find that the Forest Service gave adequate reasons for eliminating plaintiffs' proposal from detailed study. 40 C.F.R. § 1502.14(a). Therefore, this claim fails.

### 3. Analysis of Cumulative Impacts

Regulations promulgated by the CEQ require that an EIS include a discussion of environmental impacts, including impacts that are direct, indirect and cumulative. 40 C.F.R. § 1508.25. "Cumulative impact" is:

> the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

-12-

40 C.F.R. § 1508.7.  A proper cumulative impacts analysis will assess the proposed action in light of other activity that has affected or will affect the same environmental resources.  The goal is to highlight any environmental degradation that might occur if the minor effects of multiple actions accumulate over time.  For example, although a single forest project might have minimal environmental consequences, combining that project with those that preceded it and others that are anticipated might reveal a more serious overall impact.  Placing the project into a broader context that includes these recent and anticipated projects helps prevent "the tyranny of small decisions."  Council on Environmental Quality, <u>Considering Cumulative Effects Under the National Environmental Policy Act</u> 1 (January 1997), <u>available at</u> http://ceq.hss.doe.gov/nepa/ccenepa/ccenepa.htm (last viewed March 18, 2009).

With respect to the Forest Service's cumulative impacts analysis, plaintiffs allege the following deficiencies: (1) the Forest Service arbitrarily limited the geographic area of its cumulative effects analysis to a certain portion of the Chequamegon side of the CNNF; and (2) the Forest Service's analysis fails to account for certain "reasonably foreseeable" projects within the defined geographic area and fails to adequately discuss the projects that were included in the analysis.  I address these contentions below.

**a.    Selection of geographic area to be analyzed for cumulative impacts.**

One of the first steps in any cumulative effects analysis is to identify the geographic boundaries within which cumulative effects will be measured.  Identifying such boundaries "is a task assigned to the special competency of the appropriate agencies."  <u>Kleppe</u>, 427 U.S. at 414; <u>see also</u> <u>Neighbors of Cuddy Mountain v. Alexander</u>, 303 F.3d 1059, 1071 (9th Cir. 2002) (deferring to agency's determination of the scope of its cumulative impact review).  Nevertheless, "the choice of analysis scale must represent a reasoned decision and cannot be arbitrary."  <u>Idaho Sporting Cong., Inc. v. Rittenhouse</u>, 305 F.3d 957, 973 (9th Cir. 2002).

"An agency must provide support for its choice of analysis area and must show that it considered the relevant factors." Native Ecosystems Council v. Dombeck, 304 F.3d 886, 902 (9th Cir. 2002). Relevant factors include "the scope of the project considered, the features of the land, and the types of species in the area." Selkirk Conservation Alliance v. Forsgren, 336 F.3d 944, 958 (9th Cir. 2003). The presence of species habitat outside the project area is also a relevant consideration in determining the geographic scope of a cumulative impacts analysis. CEQ, supra, at 15. However, "[i]t is not practical to analyze the cumulative effects of an action on the universe"; instead, the analysis must be limited to a meaningful geographic area. Id. at 8. Thus, "the boundaries for evaluating cumulative effects should be expanded to the point at which the resource is no longer affected significantly or the effects are no longer of interest to affected parties." Id.

In the present case, the Forest Service decided to limit the relevant geographic area to regions within the Chequamegon side of the forest, excluding the Medford portion of the Chequamegon side as well as the entire Nicolet side. The regions of the CNNF that have been excluded are illustrated in the image below.



Excluding these regions meant that the Forest Service examined the environmental impact

of the Fishbone project without considering the potential effects of other forest projects that

have been or will be conducted in the excluded regions. Plaintiffs argue that because

Northern Goshawk and Red-shouldered Hawk are found throughout the entire CNNF, the Forest Service should not have ignored the environmental impact caused by projects conducted in the excluded regions.

The Forest Service argues that it drew reasonable geographic boundaries. It notes that in selecting the relevant geographic area, it reviewed studies and data collected by experts during the last twenty years regarding Northern Goshawk and Red-shouldered Hawk, including data from telemetric monitoring. After reviewing the relevant information, the Forest Service concluded that the geographic area it selected was the most meaningful because populations of goshawk and red-shouldered hawk located in the selected area did not significantly interact with populations located in the excluded regions. That is, the Forest Service concluded that the degree of interaction among the populations located in various regions of the forest was so slight that an environmental impact caused within the Fishbone project area would have little, if any, impact to a population residing on the Nicolet side of the forest. Correspondingly, an environmental impact caused on the Nicolet side would have little, if any, impact to a population residing on the Chequamegon side.[11] Thus, although certain regions of the CNNF were excluded from the selected area, the Forest Service contends that it expanded the geographic area to "the point at which the resource is no longer affected significantly or the effects are no longer of interest to affected parties." CEQ, supra, at 8.

Although plaintiffs disagree with the Forest Service's conclusion that the species do not significantly interact across the various regions, they recognize that they must defer to any

_____

[11]As stated in the EIS, the populations "do not interbreed, compete for resources, or eat each other. Put another way, the complete loss of goshawk on the Chequamegon landbase would have no impact on the viability of the goshawk population on the Nicolet landbase." EIS at 4-14 to 4-15.

reasonable determination by the Forest Service on this technical issue. Plaintiffs argue, however, that the Forest Service's determination was arbitrary and thus not entitled to deference because although the Forest Service contends that populations on the Chequamegon and Nicolet do not interact, the EIS actually states that the degree of interaction is "unknown." See EIS at 3-30 & 3-40. Plaintiffs contend that if it is true that the degree of interaction is unknown, then the Forest Service's conclusion that the populations do not interact must be arbitrary.

I find that the Forest Service's decision was not arbitrary. The EIS explains that although the Forest Service continues to study the degree of interaction among populations of goshawk and red-shouldered hawk – and thus although the degree of interaction among such populations is in some sense "unknown" – the Forest Service has enough information to reasonably conclude that any interaction among such populations is negligible. Reading the entire passage containing the word "unknown" makes this clear:

> [The selected] analysis area is appropriate for the following reasons: <u>1) In over two decades of study of goshawks in northern Wisconsin . . . , no birds have been recorded to move between the Forest's Chequamegon and Nicolet landbases and dispersal between these two areas is extremely unlikely based on recorded movements of banded individuals. The degree to which populations on the Chequamegon and Nicolet landbases interact is unknown but no information exists that compels an analysis area that is so large as to include both landbases of the CNNF or the isolated area of the Medford District.</u> 2) The cumulative effects area is relatively contiguous and, since it is predominantly a forested landscape, it is reasonable to assume that individuals could move freely within this boundary.

EIS at 3-30 (emphasis added).[12]  In other words, although the degree of interaction is "unknown," the Forest Service has enough information to conclude that interaction is "extremely unlikely."

Plaintiffs argue that by describing the degree of interaction as "unknown," while simultaneously stating in response to comments that the populations "do not interact," see EIS at 4-15, the Forest Service made contradictory statements, thereby misleading decisionmakers and interested members of the public.  However, as just discussed, a reader who reviews the entire discussion of this issue will realize that although the Forest Service cannot say with absolute certainty that there is no interaction among populations, it can, based on available data, reasonably conclude that the degree of interaction is slight and that therefore the Nicolet populations need not be included in the relevant geographic area. Plaintiffs appear to argue that by choosing to use the word "unknown," the Forest Service must have meant that it had no idea whether the populations interact, and that therefore the Forest Service must have been picking boundaries out of thin air.  But again, the surrounding discussion makes clear that the Forest Service knows a great deal about the degree of interaction – namely, that it is so slight that during twenty years' of study, not a single instance of interaction has been recorded.  This discussion satisfies the goals of informed decisionmaking and informed public participation.

**b.  Discussion of present and reasonably foreseeable projects.**

Plaintiffs next argue that the Forest Service did not adequately analyze and discuss the environmental impact of the Fishbone project in light of the cumulative effects of other projects conducted within the CNNF.  Plaintiffs make two arguments.  First, they argue that

_____

[12]Page 3-40 of the EIS contains a similar discussion with respect to Red-shouldered Hawk.

the analysis itself is superficial.  Second, they argue that the Forest Service wrongly ignored the impact of three "reasonably foreseeable" timber projects.

In their first argument, plaintiffs contend that the discussion of cumulative impacts on goshawk and red-shouldered hawk is deficient because it does nothing more than calculate the number of acres of suitable habitat for each species that will remain after harvesting. Plaintiffs contend that the Forest Service must go beyond merely counting acres and consider whether logging will harm species in other ways.[13]  However, although plaintiffs characterize the Forest Service's analysis as nothing more than counting acres, the reality is that the agency employed a more detailed methodology.

The Forest Service uses two layers of analysis when analyzing the environmental effects of forest projects.  The initial layer is the Forest Plan for the entire forest.  The Forest Plan is a document prepared pursuant to NFMA, 16 U.S.C. § 1604, and governs management of the entire forest over a period of years.  In the present case, the operative plan was prepared in 2004 and was accompanied by its own EIS and related NEPA documents. During the preparation of the 2004 Forest Plan, the Forest Service assembled a panel of research biologists and other experts to evaluate the viability of goshawk, red-shouldered hawk and other species throughout the CNNF.  See McCaslin Project Draft SEIS, App. B, at 12-13.[14]  The panel studied the effects of proposed management scenarios on species

_____

[13]It should be noted that the Forest Service's analysis of the direct and indirect effects of the Fishbone project goes beyond merely counting acres of suitable habitat.  The analysis discusses factors such as the location of specific nests, the effect of logging on individual birds, and the shape of the stands of trees that will be left after the project's completion.  See, e.g., EIS at 3-32 to 3-37.  Plaintiffs' criticism applies only to the discussion of cumulative effects – that is, the effects of the project when combined with the effects of all other projects within the forest.

[14]The McCaslin Draft SEIS is not in the Fishbone administrative record but is summarized and referenced in the Fishbone EIS.  See EIS at 3-31, 3-40 to 3-41 & 4-13 (response to cmt. 1-13).

viability.  Id.  Using the results of the study, the Forest Service defined "thresholds" of suitable habitat that are believed to maintain or improve species viability.  Id. at 13.  Actions implementing the Forest Plan (such as the Fishbone project and other projects in the forest) are expected to contribute toward a habitat total that falls within the defined thresholds.  Id.

In the second layer of environmental review, the Forest Service prepares the required NEPA documents for a specific forest project.  Here, those documents are the Fishbone EIS and related documents.  When analyzing cumulative effects at the project level, the Forest Service first determines whether, when combined with the cumulative effects of other projects, the effects of the project will result in an amount of suitable habitat that is within the threshold defined in the Forest Plan.[15]  If the project fits within the threshold, the Forest Service relies on its analysis in the Forest Plan and concludes that the project complies with the overall management directive for the species.  If the project does not fit within the threshold, then further study is necessary to determine the overall effect.  EIS at 3-31.  In the present case, the Forest Service concluded that the Fishbone project complied with Forest Plan thresholds for goshawk and red-shouldered hawk.  EIS at 3-38 & 3-43.  Therefore, the Forest Service relied on the cumulative effects analysis performed at the Forest Plan level for purposes of assessing the overall effect on such species.

Plaintiffs ignore this initial layer of cumulative effects analysis and focus only on the analysis performed in the Fishbone EIS.  Because of their failure to discuss the analysis performed at the Forest Plan level, they have provided me with no grounds for concluding that the total analysis – i.e., the combination of analysis performed at both the Forest Plan and

_____

[15]See EIS at 3-31 ("The cumulative effects analysis for this project will determine if the suitable goshwak habitat is within the range of the Forest Plan Alternatives 3-9, which is an increase of between 0.26 percent and 0.51 percent in the amount of upland hardwood habitat after 10 years of the 2004 Forest Plan implementation.").

site-specific level – is deficient.  As noted, the Forest Service relied on the thresholds established at the Forest Plan level, and unless those thresholds are themselves inadequate under NEPA or the Forest Service failed to determine whether the Fishbone project complied with those thresholds, the Fishbone analysis must be considered adequate.  Accordingly, the present case is different from <u>Klamath-Siskyou Wildlands Center v. Bureau of Land Management</u>, where the Ninth Circuit stated that "[a] calculation of the total number of acres to be harvested" is not a sufficient cumulative effects analysis.  387 F.3d 989, 995 (9th Cir. 2004).  In the present case, the Forest Service has done more than simply count acres.  It has studied the forest and the species and determined the amount of suitable habitat that correlates with the desired level of species viability.

Plaintiffs next argue that the Forest Service wrongly excluded three reasonably foreseeable timber projects – Twin Ghost, Northwest Sands, and Washburn Red Pine Thinning – from the cumulative effects analysis.  The Forest Service concedes that it did not consider these three projects when it analyzed cumulative effects for the Fishbone project.  However, the Forest Service contends that it did not have meaningful information about the details of these projects at the time that the Fishbone EIS was prepared (June 2007), or at the time when the Fishbone project was approved (also June 2007).  Therefore, argues the Forest Service, it was not required to discuss the project in the Fishbone EIS.

As indicated, the CEQ regulations require that an EIS include a discussion of the environmental impact of the project when added to "other past, present and <u>reasonably foreseeable future</u> actions."  40 C.F.R. § 1508.7 (emphasis added).  The regulations do not define "reasonably foreseeable future actions."  However, courts have applied the "rule of reason" discussed above to the question of whether an agency should have discussed a particular future action in its EIS.  <u>See</u> <u>City of Oxford, Ga. v. Fed. Aviation Admin.</u>, 428 F.3d

1346, 1353-54 (11th Cir. 2005). Thus, whether (and to what extent) the future action should have been discussed turns on the amount of discussion necessary to serve the two principal purposes of NEPA: ensuring informed decisionmaking and informed public participation. Id.

In my decision in Habitat IV, I addressed an argument by plaintiffs that is similar to the present one. I concluded that although the Forest Service should at least disclose the possibility of a future project taking place in the relevant geographic area, if that project has not yet progressed to a stage at which its environmental impacts can be measured or anticipated, an EIS should not be invalidated for failure to discuss such a project. Habitat IV, 539 F. Supp. 2d at 1034-36. In the present case, I again find that the Forest Service should have at least stated in the Fishbone EIS that these three projects were in planning stages so that a reader would have been aware that some additional activity in the region was contemplated. Nevertheless, I cannot say that the failure to mention the projects renders the EIS invalid. It is not the mere fact that the projects were contemplated that is important; what is important is that their environmental effects be disclosed if known or susceptible to reasonable forecasting. See CEQ, supra, at 19 (stating that NEPA requires "reasonable forecasting" and that agencies must predict environmental impact of proposed actions before they are fully known). Although plaintiffs cite evidence showing that the Forest Service had begun to plan these three projects before finally approving the Fishbone project, no evidence allows me to conclude that the planning on any of them had progressed to a stage at which their environmental effects could have been meaningfully predicted. Plaintiffs do not, for example, point to any evidence showing that the Forest Service knew enough about the projects to enable them to reasonably predict the amount of suitable habitat that each project might destroy. To be sure, plaintiffs point out that the Forest Service had begun the field surveys and landscape analyses that it uses to formulate project objectives, a "purpose and

need" had been defined for Northwest Sands, and a project area boundary had been identified for Twin Ghost. (Pls.' Supp. Reply Br. at 8.) However, plaintiffs do not connect the dots and show that the completion of any of these tasks meant that the Forest Service was in a position to meaningfully predict the environmental effects of each project. Thus, as in Habitat IV, the record does not indicate that the Forest Service knew anything about the environmental impacts of these projects other than that they probably will involve some logging.

Furthermore, plaintiffs again fail to account for the Forest Plan, which is a forward-looking document designed to guide forest management activities, including timber projects. R. 000095 ("The cumulative effects of implementing the program of actions anticipated under [the Forest Plan] have already been assessed – usually 10 to 15 decades into the future."). As noted, in preparing the Forest Plan, the Forest Service defined thresholds designed to promote the viability of sensitive species, including Northern Goshawk and Red-shouldered Hawk. On the project level, the Forest Service ensures that the project under review complies with Forest Plan thresholds. By specifying guidelines in this fashion, the Forest Plan helps to minimize the risk that the environmental effects of future forest projects will accumulate over time and yield unexpected environmental impacts. This is not to say that the Forest Service can abdicate its responsibility to evaluate cumulative effects in connection with a specific project, but if the Forest Service had to revise an EIS for one project every time it began to develop or modify a separate project, the NEPA process would be chaos. The Forest Plan helps to alleviate the need to constantly reevaluate projects by predicting the long-term impact of a series of forest management activities and specifying overall guidance for them.

-23-

In the present case, no evidence suggests that either Twin Ghost, Northwest Sands, or Washburn Red Pine Thinning will cause deviation from the guidelines in the Forest Plan or result in a reduction of suitable habitat below the thresholds identified in the Forest Plan. Thus, to some extent, the cumulative impacts of such projects have already been accounted for. However, if in the future the Forest Service is able to reasonably predict that the three inchoate projects will, when combined with Fishbone and other projects, result in an unexpected deviation from the Forest Plan, the Forest Service may need to prepare a supplemental EIS to address this significant change in the environmental landscape. See Wisconsin v. Weinberger, 745 F.2d 412, 418 (7th Cir. 1984) (holding that an agency should prepare a supplemental EIS when "new information provides a seriously different picture of the environmental landscape such that another hard look is necessary") (emphasis in original); Habitat IV, 539 F. Supp. 2d at 1039-40 (discussing legal standards governing agency's duty to prepare supplemental EIS). For instance, if at some point the Forest Service is able to reasonably predict that the impact of one of the new projects will change the conclusion in the Fishbone EIS that the cumulative effects of all projects in the area will not "result in a deviation below the threshold for goshawk habitat quantity," EIS at 3-38, supplementation may be required. At the this time, however, there is no evidence showing that any of the new projects will result in a seriously different picture of the environmental landscape.

**B.    NFMA**

In addition to NEPA, plaintiffs challenge the Fishbone project under NFMA, which, as noted, directs the Secretary of Agriculture to develop a Forest Plan for each of the national forests. 16 U.S.C. § 1604. All site-specific projects must be consistent with the governing forest plan. 16 U.S.C. § 1604(i). The operative plan for the CNNF was adopted in 2004.

Because NFMA does not contain a private right of action, plaintiffs' NFMA claims must be analyzed under the APA. Indiana Forest Alliance, Inc. v. United States Forest Service, 325 F.3d 851, 862 (7th Cir. 2003). Thus, as under NEPA, my only role is to ensure that the Forest Service took a hard look at the relevant NFMA issues in making its decision and did not act arbitrarily or capriciously. Id.

Plaintiffs argue that the Fishbone project violates NFMA because the project is not consistent with the Forest Plan. Specifically, plaintiffs argue that the project is inconsistent with the Forest Plan's objective of "improv[ing] habitat conditions for Regional Forester Sensitive Species." See Forest Plan at 1-2 (Objective 1.1b). Both Northern Goshawk and Red-shouldered Hawk are Regional Forester Sensitive Species ("RFSS"). See Forest Plan at 2-20 to 2-21.

Plaintiffs do not explain what the Forest Plan means by "improv[ing] habitat conditions for Regional Forester Sensitive Species." Obviously, this is a rather broad objective and could be achieved in a number of different ways. It appears that plaintiffs believe that the Fishbone project is inconsistent with this objective because it will reduce the amount of suitable goshawk territory in the project area by 47% and allow some logging in areas close to existing goshawk nests. (Pls.' Opening Br. at 69.) However, plaintiffs have not shown that actions that reduce habitat within the project area or involve harvesting near nests are themselves inconsistent with the Forest Plan.[16] Instead, they argue that these design features "strongly

---

[16]At oral argument, plaintiffs seemed to argue that the Forest Service failed to maintain proper "buffers" around known goshawk nests. It is not clear if plaintiffs mean to assert a separate challenge based on these buffers, but if so, I find that the Forest Service has adequately explained its decision to employ "irregular" as opposed to "circular" buffers. The EIS explains that all nest sites will be protected by the 30-acre buffer recommended in the Forest Plan. EIS at 3-32. However, due to the irregular shape of the aspen stands and the location of the nest trees within those stands, the 30-acre buffers are not circular and do not place the nests in the center. Id. Instead, the buffers are irregularly shaped and some of the

suggest" that the selected alternative will not improve habitat for RFSS.  (Id.)  But this argument begs a further question: Does the Forest Plan require that all forest projects improve habitat for RFSS within the immediate project area?  In deciding to implement the Fishbone project, the Forest Service determined that although the project would have detrimental effects on goshawk within the project area, conditions for goshawk within the broader cumulative effects region for the project would improve.  ROD at 11 ("[T]he amount of habitat for goshawk across CNNF lands in the cumulative effects area . . . shows an increasing trend even with other vegetation management actions occurring in suitable habitat.").  Thus, although the Fishbone project may not itself improve habitat for goshawk in the immediate project area, the project is consistent with the Forest Service's overall management of the forest, which in its judgment will result in a net benefit to the species.[17]

Because plaintiffs have not shown that every project in the forest must itself improve habitat for RFSS within its immediate boundaries, and because the Forest Service reasonably concluded that, overall, habitat for goshawk within the cumulative effects area for the project

_____

nests are located at the buffers' edges.  The Forest Service explains that the irregular shape will maximize the amount of suitable habitat encompassed by the buffer.  (Tr. of Oral Arg. at 31-32.)  After consulting wildlife biologists, the Forest Service determined that creating irregularly-shaped 30-acre buffers that maximize suitable habitat would be more beneficial than maintaining circular buffers containing mostly unsuitable habitat.  (Id.)  The upshot of using irregularly-shaped buffers with nests at the buffers' edges is that some logging will take place within 630 feet of two nest trees.  EIS at 3-33.  To mitigate the impact of logging near the nests, the Forest Service imposed timing restrictions to prohibit any logging near the nest areas during nesting season.  Id.  The EIS explains that these design features meet the goshawk-protection criteria outlined in the Forest Plan.  Id.  Plaintiffs have not shown that the Forest Service's preference for irregularly-shaped buffers is based on unreasonable science or that its prohibition of logging near nest sites during nesting season is not an adequate measure to minimize impact to individual goshawk.  Therefore, I can not find that the use of irregular buffers is inconsistent with the Forest Plan or violates NFMA.

[17]Plaintiffs, of course, think that the Forest Service has overstated the degree to which its management of the forest will benefit goshawk, but for the reasons explained elsewhere in this decision, the Forest Service's conclusion on this technical matter is reasonable and therefore entitled to deference.

will improve even if the project is implemented, I cannot say that the Fishbone project is inconsistent with the Forest Plan.

Plaintiffs also allude to a number of other arguments that they do not develop with precision. First, they accuse the Forest Service of acting in bad faith, arguing that although the Forest Service states that the Fishbone project is designed to promote forest health, in reality, the goals of the project "appear to be driven less by the needs of the forest ecosystem than by a desire to cut more trees." (Pls.' Supp. Br. at 13.) However, this is just plaintiffs' opinion, not a legal argument. In any event, as discussed below, the Forest Service explains that improving forest health was one of the primary goals of the Fishbone project.[18]

Before deciding to implement the Fishbone project, the Forest Service studied the project area and determined that "the biggest factor affecting forest health is the project area's large imbalance of oak and aspen age classes, and, the associated susceptibility to forest insects of concern." ROD at 11 (citations omitted). That is, in the Forest Service's judgment, the biggest threat to forest health in the area is pest infestation, and to combat such infestation, the Forest Service proposes to reduce the "over-abundance of 'over-mature' oak and aspen," which harbor disease and pests. Id. at 12. The Forest Service determined that the selected project alternative (Alternative 4) will "result[] in the largest amount of aspen regeneration and conversion to other forest types, lowering stand susceptibility to the pests of concern more than the other alternatives." Id.

Plaintiffs do not acknowledge the Forest Service's concern with pest infestation in older trees. Instead, they speculate that the Forest Service really wants to harvest older trees to

---

[18]To be sure, timber production was also a primary goal, but as plaintiffs concede, that is not unlawful. Forest Service lands are intended to be managed to allow environmentally responsible timber harvesting in order to meet the demand for forest commodities. See, e.g., Forest Plan at 1-6 (Goal 2.5 & Objective 2.5).

make room for younger trees that have higher value in timber production. (Pls.' Supp. Br. at 13.) But it is not the court's function to identify the Forest Service's motive. The court's function is to determine whether the Forest Service's conclusions are arbitrary or capricious. 5 U.S.C. § 706(2). As discussed, the Forest Service has given a reasoned explanation showing that the Fishbone project will improve forest health, and therefore I cannot find that its decision was arbitrary or capricious.

Plaintiffs' remaining argument is that the Forest Service defined the Fishbone project's goals too narrowly, and that therefore all of the project alternatives were skewed to favor timber production. (Pls.' Supp. Reply Br. at 12.) Plaintiffs state that the Forest Service "select[ed] a narrow purpose and need that emphasizes the 'economic value' of trees in the project area rather than the broader purpose of implementing the 2004 Forest Plan." (Id. at 12-13.) However, as explained, the Forest Service studied the project area and reasonably determined that the best way to improve forest health (and thereby implement the Forest Plan) would be to reduce over-mature aspen and oak stands to prevent infestation and disease. The Forest Service also identified four other project goals, including timber production, that were designed to implement the Forest Plan. See also supra pp. 10-12. Plaintiffs do not point to any one of the five project goals and show that it is unreasonably narrow or was formulated in bad faith. Instead, they simply speculate that because the goals resulted in project alternatives that all produce "roughly the same desired high timber production result" (Pls.' Opening Br. at 28-29), the Forest Service must have rigged the project's goals to favor logging. However, if the project goals were reasonable to begin with, the fact that all reasonable alternatives yield similar amounts of timber is not grounds for

invalidating the project.[19]   Again, plaintiffs have not shown that the project goals are unreasonable, and I cannot upset the Forest Service's decision based on plaintiffs' speculation that the goals were rigged.  Therefore, this argument fails.

### III.  CONCLUSION

For the reasons stated, **IT IS ORDERED** that plaintiffs' motion for summary judgment is **DENIED** and defendants' motion for summary judgment is **GRANTED**.

**IT IS FURTHER ORDERED** that the parties' motions for leave to file briefs in excess of the page limitations (Docket ## 38 & 43) are **GRANTED**.

The clerk of court shall enter final judgment.

Dated at Milwaukee, Wisconsin, this 19 day of March, 2009.


/s_____
LYNN ADELMAN
District Court Judge

---

[19]In any event, it is questionable whether all of the alternatives produce "roughly the same" amount of timber.  The timber outputs of the various action alternatives range between 42 and 50 million board feet, and plaintiffs have cited nothing but their own opinion to support the notion that 8 million board feet is not a significant difference.

Case 2:08-cv-00043-LA   Filed 03/19/09   Page 29 of 29   Document 59